NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220246-U

NO. 4-22-0246

IN THE APPELLATE COURT

FILED
August 10, 2022
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* A.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
| Petitioner-Appellee, | ) | No. 19JA87 |
| v. | ) | |
| Karen B., | ) | Honorable |
| Respondent-Appellant). | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court granted appellate counsel's motion to withdraw and affirmed
the trial court's judgment terminating respondent's parental rights as no
meritorious issues could be raised on appeal.

¶ 2    On March 11, 2021, the trial court entered an order terminating the parental rights

of respondent, Karen B., to her son, A.B. (born November 11, 2019). Karen B. appealed.

Appellate counsel now moves to withdraw pursuant to *Anders v. California*, 386 U.S. 738

(1967), on the basis that she cannot raise any potentially meritorious argument on appeal.

Counsel's notice of filing and proof of service indicate that she sent a copy of her motion and

brief to Karen B. by mail. Karen B. has not filed a response. After reviewing the record and

counsel's brief, we grant counsel's motion to withdraw and affirm the judgment of the trial court.

¶ 3                                            I. BACKGROUND

¶ 4        On November 15, 2019, the State filed a petition for adjudication of wardship regarding A.B. The petition alleged that A.B. was abused and neglected by his parents, Karen B. and Norman B., in that he was in an environment injurious to his health and well-being. Later in the proceedings, it was determined that Norman B. was not A.B.'s biological father. The petition for adjudication of wardship alleged Karen B. had given birth to other children who were not presently in her care. Her parental rights to two of her other children had already been terminated, and a third child was in protective custody. The trial court entered an order placing A.B. in the temporary custody of the Department of Children and Family Services (DCFS).

¶ 5        On June 29, 2020, an adjudicatory hearing was held. The trial court entered an order finding that A.B. was neglected in that he was in an environment injurious to his welfare.

¶ 6        On October 6, 2020, the trial court entered a dispositional order finding that Karen B. was unable and unwilling to care for A.B. The court made A.B. a ward of the court and granted custody and guardianship to DCFS. The court ordered Karen B. to cooperate with DCFS and comply with the terms of a service plan.

¶ 7        On June 23, 2021, the State filed a motion to terminate the parental rights of Karen B. The motion alleged Karen B. had failed to make reasonable efforts to correct the conditions that were the basis for A.B.'s removal and had failed to make reasonable progress toward A.B.'s return during the nine-month periods from June 30, 2020, through March 29, 2021. The State later added an allegation that Karen B. had also failed to make reasonable progress toward A.B.'s return during the nine-month period from March 29, 2021, through December 29, 2021.

¶ 8        On March 11, 2022, the trial court held a termination hearing. Samantha Houghton testified she became Karen B.'s DCFS caseworker in June 2020. She first evaluated a

service plan in connection with the case in August 2020. Pursuant to the service plan, Karen B. was required to complete tasks relating to the following categories: (1) cooperation and participation, (2) substance abuse, (3) mental health, (4) housing and budgeting, and (5) parenting and visitation. Houghton rated Karen B.'s performance of all these tasks as unsatisfactory. Karen B. was not attending services and did not have consistent contact with Houghton. Karen B. had not attended substance abuse services since October 2019, and she failed to complete two drug screens. She had not participated in mental health services since January 2020. Karen B. advised Houghton that her residence had been condemned and she was living periodically at a hotel while trying to repair it. Karen B. was not consistent with visitation.

¶ 9        Houghton continued to work as Karen B.'s caseworker during the next reporting period. Houghton generated a second report dated February 23, 2021, which covered the period between August 2020 and February 2021. This service plan required Karen B. to engage in the same tasks as the previous service plan. It also required her to engage in domestic violence victim services because she told Houghton she had suffered significant domestic violence during a new relationship. Houghton rated Karen B.'s performance as "unsatisfactory" for each of the required tasks during the period covered by the service plan. Karen B. had very sporadic, limited contact with Houghton, and she did not engage in any services. She admitted to using marijuana, missed two drug screens, and failed to attend substance abuse counseling. She did not engage in any mental health services during that period. Karen B. did not have a fixed residence during that time period, and she was homeless briefly. Karen B. did not attend any visits with A.B. in December or January and did not consistently engage in visitation after January.

¶ 10        Houghton testified that both the August 2020 service plan and the February 2021 service plan were generated in the regular course of business pursuant to DCFS policy. She

stated the February 2021 service plan was a "true and accurate representation of the contents within." She indicated the August 2020 service plan was "a true and accurate representation of the—and collection of the events as they occurred." Houghton continued to serve as the caseworker in A.B.'s case until April 2021. She did not see any improvement in Karen B.'s participation in the service plan between February and April 2021.

¶ 11 Stacy Bucher testified she became Karen B.'s caseworker in April 2021. There was already a service plan in place at that time, and Bucher monitored Karen B.'s progress with the service plan. Bucher subsequently generated a service plan dated August 11, 2021. She stated the August 2021 service plan was created in the regular course of business, she was "responsible for" the information contained in the service plan, and the service plan was a true and accurate representation of the information contained in it. Bucher stated there were no changes to Karen B.'s required tasks from previous service plans.

¶ 12 Bucher rated Karen B.'s performance of all the tasks contained in the service plan as "unsatisfactory," as she did not make any progress toward any of her tasks. Karen B.'s phone contact with Bucher was "random." Karen B. "[u]sually ended up hanging up on [Bucher] after cursing [her] out." Bucher scheduled four appointments with Karen B. during the time covered in the August 2021 service plan, but Karen B. did not attend any of them. She did not engage in any substance abuse, mental health, or domestic violence victim services. She did not have stable housing during the period covered by the service plan and was homeless. She had been staying at a hotel but was "kicked out" after having an altercation with someone there. Karen B.'s visitation was suspended during this period, and she never asked Bucher about A.B.'s wellbeing.

¶ 13 Bucher had remained the caseworker until approximately two weeks prior to the termination hearing. Since August 2021, Karen B. had not engaged in any services or met with

- 4 -

Bucher. Karen B. was in jail at the time of the hearing.

¶ 14 The State requested that the court admit the three service plans into evidence. No objection was made, and the trial court admitted the service plans.

¶ 15 The trial court found the State had proven by clear and convincing evidence Karen B. was unfit in that she failed to make reasonable efforts to correct the conditions which were the basis for A.B.'s removal and failed to make reasonable progress toward A.B.'s return during either of the nine-month periods in question. The court stated the evidence was "overwhelming" and showed Karen B. was "essentially a nonparticipant in the case" during the two nine-month periods.

¶ 16 The matter proceeded to a determination of the best interest of A.B. Bucher testified A.B. had been living with his foster parents and two of his biological half-siblings since shortly after his birth. Based on Bucher's observations, A.B. appeared to be very comfortable in his foster home. A.B.'s foster parents were willing to adopt him, and DCFS recommended that he be adopted by his foster parents.

¶ 17 The court found the State had shown by a preponderance of the evidence that it would be in A.B.'s best interest to terminate the parental rights of his natural parents and change the permanency goal to adoption. The court noted that A.B. had lived with his foster parents since shortly after his birth and seemed to have bonded with them. The court found that A.B.'s foster home was safe and appropriate and that his needs were being met. The court noted that there had been no evidence to show any relationship existed between A.B. and his biological parents at the time of the termination hearing. The court further noted that there was no evidence as to when, if ever, A.B.'s natural parents would be in a position to be able to have A.B. placed with either of them. The court found that DCFS's adoption plan was A.B.'s best opportunity for

permanency.

¶ 18    Karen B. subsequently appealed the court's termination order.

¶ 19                                   II. ANALYSIS

¶ 20    On appeal, appellate counsel seeks to withdraw on the basis that she cannot raise any arguments of potential merit.

¶ 21    The procedure for appellate counsel to withdraw set forth in *Anders* applies to findings of parental unfitness and termination of parental rights. *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000). Under this procedure, counsel's request to withdraw must "be accompanied by a brief referring to anything in the record that might arguably support the appeal." *Id.* (quoting *Anders*, 386 U.S. at 744). Counsel must "(a) sketch the argument in support of the issues that could conceivably be raised on appeal, and then (b) explain why he believes the arguments are frivolous." *Id.* Counsel must then conclude the case presents no viable grounds for appeal. *Id.* In doing so, counsel should review both the unfitness finding and the best interest determination and indicate in the brief that he or she has done so. *Id.* at 685-86.

¶ 22    In the instant case, counsel asserts she has reviewed the record on appeal, including the report of proceedings of the termination hearing, and has concluded there are no appealable issues of merit. Counsel asserts she has considered raising the following arguments concerning the determination of parental unfitness: (1) the State failed to lay a proper foundation for the admission into evidence of the service plans, (2) counsel provided ineffective assistance in failing to object to the admission of the service plans, (3) counsel was ineffective for failing to object to the testimony of the caseworkers, and (4) the trial court's finding of unfitness was against the manifest weight of the evidence. Counsel also indicates she has considered arguing the court's finding that it was in the best interest of the minor to terminate Karen B.'s parental

rights was not supported by the applicable statutory factors. We address each argument in turn and ultimately agree with counsel's conclusion that there are no issues of arguable merit to be raised on review.

¶ 23                           A. Finding of Parental Unfitness

¶ 24                           1. *Foundation for Admission of Service Plans*

¶ 25        Counsel indicates she has considered raising the issue of whether the trial court erred in admitting the three service plans into evidence without a proper foundation. Specifically, counsel has considered arguing there was no proper foundation laid for the service plans because the State failed to establish they were made at the time of the recorded acts or events or within a reasonable time thereafter.

¶ 26        As counsel acknowledges, Karen B. forfeited this issue by failing to object to the admission of the service plans at the termination hearing. In criminal cases, the plain error doctrine allows a reviewing court to consider unpreserved error when a clear or obvious error occurs and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The plain error doctrine may also be applied in cases involving the termination of parental rights, as such cases concern a fundamental liberty interest. See *In re L.B.*, 2015 IL App (3d) 150023, ¶ 11; *In re Andrea D.*, 342 Ill. App. 3d 233, 242 (2003). The first step in plain error analysis is determining whether a clear or obvious error occurred. *Piatkowski*, 225 Ill. 2d at 565.

¶ 27        Section 2-18(4)(a) of the Juvenile Court Act (Act) (705 ILCS 405/2-18(4)(a)

(West 2018)) provides:

> "Any writing, record, photograph or x-ray of any hospital or public or private
> agency, whether in the form of an entry in a book or otherwise, made as a
> memorandum or record of any condition, act, transaction, occurrence or event
> relating to a minor in an abuse, neglect or dependency proceeding, shall be
> admissible in evidence as proof of that condition, act, transaction, occurrence or
> event, if the court finds that the document was made in the regular course of the
> business of the hospital or agency and that it was in the regular course of such
> business to make it, at the time of the act, transaction, occurrence or event, or
> within a reasonable time thereafter."

"This provision is a variation of the common-law 'business records' exception to the hearsay rule." *In re A.B.*, 308 Ill. App. 3d 227, 235 (1999). The State may satisfy the foundational requirements of the statue by establishing the writing was made: "(1) as a memorandum or record of the event, (2) in the regular course of business, and (3) at the time of the event or within a reasonable time thereafter." *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 55; 705 ILCS 405/2-18(4)(a) (West 2018).

¶ 28    The admission of evidence pursuant to section 2-18(4)(a) of the Act is reviewed for an abuse of discretion. *Z.J.*, 2020 IL App (2d) 190824, ¶ 55.

¶ 29    We find the decision in *Z.J.*, 2020 IL App (2d) 190824, to be instructive. In *Z.J.*, the respondent mother argued that eight service plans were improperly admitted at the termination hearing because the State failed to lay a proper foundation for their admission. *Id.* ¶ 49. Specifically, she argued the State had failed to elicit testimony concerning whether the entries in the services plans were made " 'at the time of the act, transaction, occurrence or event,

- 8 -

or within a reasonable time thereafter.' " *Id*. ¶ 56 (quoting 705 ILCS 405/2-18(4)(a) (West 2018)). The respondent mother acknowledged she forfeited the issue but requested that the court review the issue under the plain error doctrine. *Id.* ¶ 50.

¶ 30    The *Z.J.* court held no error occurred concerning the admission of the service plans. *Id.* ¶ 51. The court noted that, with one exception, a new service plan was prepared approximately every six months. *Id.* ¶ 57. The court stated:

> "Each service plan identified various tasks and task-related 'action steps' for each participant to complete during the relevant review period. Each plan also listed establishment and evaluation dates for each task, start and evaluation dates for each 'action step,' an evaluation narrative for each task and 'action step,' and a summary of the family's progress since the last review." *Id.*

The court found that, while the service plans did not document the exact date of every task or "action step," each plan "clearly buil[t] upon the previous plan by detailing the extent, if any, of respondent's participation in and progress on the tasks and 'action steps' identified therein over the approximate six-month period preceding the date of the plan." *Id.* ¶ 61. The *Z.J.* court concluded this "constitute[d] sufficient evidence from which it could be determined that the plans were made at or within a reasonable time after each act or occurrence recorded in the service plans," and, accordingly, the trial court did not abuse its discretion by admitting the service plans. *Id.*

¶ 31    Here, as in *Z.J.*, the caseworkers who testified at the termination hearing offered no testimony concerning whether the entries in the service plans were made at the time of the acts and occurrences described in the plans or within a reasonable time thereafter. However, the service plans admitted in this case were substantially similar to the ones described in *Z.J.* Like in

*Z.J.*, the service plans covered six-month time periods, contained the dates the plans were initiated, and contained a summary of the participants' progress since the last review. The service plans contained "desired outcomes" for Karen B. as well as "action steps" supporting each desired outcome. The plans included dates of establishment, target dates of achievement, and evaluation dates for each of the "desired outcomes" and "action steps." They also included descriptions of the caseworker's evaluation of Karen B.'s progress toward each "desired outcome" and "action step." As in *Z.J.*, the trial court could have concluded this was "sufficient evidence from which it could be determined that the plans were made at or within a reasonable time after each act or occurrence recorded in the service plans." *Id.* Accordingly, there was no error in the admission of the service plans in this case.

¶ 32        2. *Ineffective Assistance of Counsel—Admission of Service Plans*

¶ 33        Appellate counsel asserts she has also considered raising the issue of whether Karen B.'s trial counsel was ineffective for failing to object to the admission of service plans on the basis that the State failed to lay an adequate foundation.

¶ 34        Parents have a statutory right to the effective assistance of counsel in proceedings to terminate parental rights. *In re Br. M.*, 2021 IL 125969, ¶ 42. Claims of ineffective assistance of counsel in termination proceedings are governed by the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Br. M.*, 2021 IL 125969, ¶ 43; *In re M.D.*, 2022 IL App (4th) 210288, ¶ 92. "Under that standard, a parent must show that (1) counsel's performance failed to meet an objective standard of competence and (2) counsel's deficient performance resulted in prejudice to the parent." *M.D.*, 2022 IL App (4th) 210288, ¶ 92.

¶ 35        Here, because we have previously determined the service plans were admissible despite the alleged foundational issue (*supra* ¶ 31), a foundation objection by counsel would

have been properly overruled. Thus, counsel was not ineffective for failing to object.

¶ 36        3. *Ineffective Assistance of Counsel—Caseworkers' Testimony*

¶ 37        Appellate counsel asserts she has also considered raising the issue of whether Karen B.'s counsel during the termination proceedings was ineffective for failing to object when Houghton and Bucher testified concerning the contents of the service plans. Appellate counsel notes that " '[a] witness is *** not permitted to testify as to the contents of the document or provide a summary thereof; the document "speaks for itself." ' " *A.B.*, 308 Ill. App. 3d at 236 (quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.10, at 825 (7th ed.1999)).

¶ 38        In the instant case, Karen B.'s counsel at the termination hearing was not ineffective for failing to object to Houghton's and Bucher's testimony concerning the service plans. Houghton and Bucher had firsthand knowledge of the contents of the service plans and so, their testimony was proper. See *Z.J.*, 2020 IL App (2d) 190824, ¶ 64 (holding that it was proper for a caseworker to provide firsthand testimony of her interactions with the respondent mother and the respondent mother's progress with respect to the tasks she was assigned to complete).

¶ 39        4. *Finding of Unfitness*

¶ 40        Appellate counsel indicates she has also considered arguing the trial court's finding that Karen B. was unfit was against the manifest weight of the evidence.

¶ 41        Parental rights may not be terminated without the parent's consent unless the trial court first determines, by clear and convincing evidence, the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Pursuant to section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2018)), a parent may be found unfit if she fails "(i) to make reasonable efforts to correct the

conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor \*\*\*, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor."

¶ 42    "A trial court's determination that a parent's unfitness has been established by clear and convincing evidence will not be disturbed on review unless it is contrary to the manifest weight of the evidence." *Gwynne P.*, 215 Ill. 2d at 354.

¶ 43    Here, the State alleged Karen B. was unfit for failing to (1) make reasonable efforts to correct the conditions that led to A.B.'s removal and (2) make reasonable progress toward the return of A.B. during the nine-month periods from June 30, 2020, through March 29, 2021, and from March 29, 2021, through December 29, 2021. See 750 ILCS 50/1(D)(m) (West 2018). The trial court found the State had established both grounds of unfitness by clear and convincing evidence. The court stated the evidence was "overwhelming" and Karen B. was "essentially a nonparticipant in the case."

¶ 44    The trial court's finding of unfitness was not against the manifest weight of the evidence. Houghton's and Bucher's testimony showed Karen B. made virtually no progress toward the return of A.B. during the nine-month periods in question. Karen B. did not maintain consistent contact with her caseworkers, failed to obtain adequate housing, and missed several drug screens. She failed to engage in substance abuse, mental health, or domestic violence victim services. She did not consistently engage in visitation, and she failed to inquire about A.B.'s well-being after visitation was suspended.

¶ 45    As Karen B.'s failure to make reasonable progress alone supported the court's finding of unfitness, we need not address whether she also failed to make reasonable efforts to

correct the conditions that led to A.B.'s removal. See *Gwynne P.*, 215 Ill. 2d at 349 ("A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence.").

¶ 46                              B. Best Interest Determination

¶ 47        Appellate counsel indicates she has considered arguing the trial court's best interest finding was not supported by the applicable statutory factors because the trial court failed to mention the factors in making its best interest determination.

¶ 48        When a trial court finds a parent to be unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004). In making the best interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2018)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these

- 13 -

factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 49    At a best-interest hearing, the State must prove by clear and convincing evidence that termination of parental rights is in the best interest of the minor. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). On review, "[w]e will not disturb a court's finding that termination is in the children's best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 50    In the instant case, while the trial court did not expressly reference section 1-3(4.05) of the Act, it explicitly considered several of the factors set forth in that section. Specifically, the court considered that A.B. had lived with his foster parents and two half-siblings since shortly after he was born and had bonded with his foster parents. The court noted that the foster home was safe and appropriate and that A.B.'s needs were being met there. The court found the best opportunity for permanency was through DCFS's adoption plan for A.B.'s foster placement. The court also noted there was no evidence presented that A.B. had a relationship with either of his natural parents at the time of the termination hearing. We conclude the court's best interest finding was based on an appropriate consideration of the statutory factors and was not against the manifest weight of the evidence.

¶ 51                        III. CONCLUSION

¶ 52    For the reasons stated, we allow appellate counsel to withdraw and affirm the trial court's judgment.

¶ 53    Affirmed.